UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.

PEN YU, a/k/a "Ben Yu"

CASE NO. 8:24cr109 WFJ-TGW

18 U.S.C. § 1349

### INFORMATION

The United States Attorney charges:

### COUNT ONE

#### A.   Introduction

At times material to this Information:

1. The "Company" was a United States-based chemical and biotechnology company that offered substantial discounts and other benefits to large institutional clients, such as university laboratories. The Company also partnered with some university laboratories to operate stockrooms. Ordering through the Company's university laboratory stockrooms offered customers significant discounts that were not available to the general public, and also provided for other benefits, such as free products, free overnight shipping, and exemption from state and local taxes. The Company permitted only individuals affiliated with the laboratories to order through the stockrooms.

2. The University was a public university located in the Northern District of Florida. The University operated numerous research laboratories.

3. GREGORY MUNOZ was a United States citizen residing in Minneola, Florida. MUNOZ was employed as a salesperson for the Company. MUNOZ's sales area encompassed several universities in Florida, including the University.

4. PEN YU, a/k/a "Ben," was a United States citizen residing in Gibsonton, Florida, and elsewhere. YU worked to obtain discounted products from the Company for one or more co-conspirators in China.

5. Co-Conspirator 1 ("CC-1") was a United States citizen residing in Gainesville, Florida. CC-1 worked in the laboratory stockroom for a research laboratory at the University (the "the University Stockroom").

6. Co-Conspirator 2 ("CC-2") was a United States citizen residing in Gibsonton, Florida.

7. Co-Conspirator 3 ("CC-3") was a Chinese national and a student at the University who was not affiliated with any medical or scientific research. YU paid CC-3 and other students to use their University email addresses to place orders through the University Stockroom.

8. Researcher-1 and Researcher-2 were researchers who, prior to 2015, worked at the University. After Researchers-1 and -2 left the University, MUNOZ and YU used their names and email addresses, without their knowledge or authorization, to place orders with the Company through the University Stockroom.

9. Researcher 3 was also a researcher who operated a laboratory at the University. Researcher 3's laboratory hosted the University Stockroom. YU falsely

2

represented that he and others were affiliated with research being conducted in Researcher 3's laboratory in order to fraudulently place orders with the Company through the University Stockroom. Orders placed from the Company through the University Stockroom received benefits like substantial discounts in excess of 25% and free overnight shipping, which were not offered to other purchasers in the general public.

10. During the course of this conspiracy, MUNOZ used his position at the Company to help YU to fraudulently obtain deep discounts and other benefits from the Company through the University Stockroom by falsely representing that YU's orders were being placed by individuals affiliated with research being conducted at the University. CC-1 then used his position inside of the University Stockroom to divert the products purchased from the Company to YU, CC-2, and others, who repackaged the products for export to one or more co-conspirators in China. The co-conspirators undervalued these exports on Electronic Export Information ("EEI") contained in the Automated Export System and other shipping forms and falsely represented that the packages that they sent to China contained "diluting agents" when, in fact, they contained a wide variety of products, including small quantities of analytical samples of List 1 chemicals, analytical samples of controlled substances, and purified noncontagious proteins (PNP) of contagious diseases. One or more co-conspirators in China then sold these deeply discounted products to laboratories in China for a profit.

## B. The Conspiracy

11. Beginning in or around July of 2016, and continuing until in or around May of 2023, in the Middle District of Florida and elsewhere, the defendant,

PEN YU,
a/k/a "Ben Yu,"

did knowingly and willfully combine, conspire, and agree with other persons, known and unknown to the United States Attorney, to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises that related to material facts, and, for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343.

## C. Manner and Means

12. The manner and means by which the co-conspirators sought to accomplish the objects of the conspiracy included, among others:

　　a. It was part of the conspiracy that YU would and did receive from one or more co-conspirators in China lists of Company products that they wished to order;

　　b. It was further part of the conspiracy that YU and other co-conspirators would and did coordinate with MUNOZ to order products from the Company to be shipped to the University Stockroom;

c. It was further part of the conspiracy that MUNOZ would and did make material false misrepresentations and omissions to the Company in order to obtain substantially discounted quotes for products to be ordered by YU for one or more co-conspirators in China through the University Stockroom;

d. It was further part of the conspiracy that YU, MUNOZ, CC-2, CC-3, and other co-conspirators would and did make material false misrepresentations and omissions to the Company to place orders through the University Stockroom and thereby receive substantial discounts and other benefits, such as free overnight shipping;

e. It was further part of the conspiracy that YU, MUNOZ, and other co-conspirators would and did use, without authorization, the names and email addresses of former researchers at the University to place orders from the Company through the University Stockroom;

f. It was further part of the conspiracy that YU would and did pay individuals employed or enrolled at the University, including CC-1 and CC-3, to use those individuals' University email addresses to place orders from the Company through the University Stockroom;

g. It was further part of the conspiracy that CC-1 would and did receive shipments from the Company in the University Stockroom, and would and did divert the products to YU, MUNOZ, CC-2, and other co-conspirators;

h. It was further part of the conspiracy that CC-1, CC-2, and other co-conspirators would and did send to YU photographs of shipments from the

Company received in the University Stockroom to notify YU when the shipments had arrived;

  i. It was further part of the conspiracy that YU, MUNOZ, and CC-2 would and did travel to meet CC-1 to retrieve products ordered from the Company through the University Stockroom and transport them to the Middle District of Florida;

  j. It was further part of the conspiracy that YU, CC-2, and other co-conspirators would and did repackage products ordered from the Company through the University Stockroom for reshipment to one or more co-conspirators in China;

  k. It was further part of the conspiracy that YU, CC-2, and other co-conspirators would and did ship products ordered from the Company through the University Stockroom to one or more co-conspirators in China;

  l. It was further part of the conspiracy that YU, CC-2, and other co-conspirators would and did falsely declare on shipping forms that the shipments that they were sending to China contained "diluting agents" and would and did falsely undervalue the shipments on those shipping forms, thereby causing the shipping companies to fail to enter EEI into the Automated Export System as required;

  m. It was further part of the conspiracy that YU would and did send emails containing order confirmations from the Company to one or more co-conspirators in China;

n. It was further part of the conspiracy that YU would and did pay CC-1, CC-2, CC-3, and other co-conspirators for their work in furtherance of the conspiracy;

o. It was further part of the conspiracy that YU would and did provide favorable loans to CC-1, CC-2, and other co-conspirators, and would and did permit RING, CC-2, and other co-conspirators to repay their loans by working in furtherance of the conspiracy;

p. It was further part of the conspiracy that YU would and did provide gift cards other benefits such as free vacations to MUNOZ, CC-1, CC-2, and other co-conspirators;

q. It was further part of the conspiracy that co-conspirators would and did employ various techniques to protect their anonymity and to thwart detection of their activities by government and law-enforcement agencies; and

r. It was further part of the conspiracy that co-conspirators would and did perform acts and make statements to misrepresent, hide, and conceal, and cause to be misrepresented, hidden, and concealed, the purpose of the conspiracy and the acts committed in furtherance thereof.

### E. Overt Acts

13. In furtherance of the conspiracy, and to effect the objects thereof, at least one of the co-conspirators committed or caused to be committed the following overt acts, among others, in the Middle District of Florida and elsewhere:

## 2016

a. On or about July 8, 2016, YU sent an email to MUNOZ titled "First Order," which contained a spreadsheet listing over 140 items that YU wished to order from the Company through the University Stockroom.

b. On or about September 14, 2016, CC-1 sent a text message to YU stating, "Ben, I believe I have 35 or 36 boxes for you today."

c. On or about October 24, 2016, YU sent an email to MUNOZ requesting a quote from the Company for several products to be ordered through the University Stockroom with a total value of approximately $31,000 and requesting a discount of 26%.

d. On or about October 24, 2016, MUNOZ set an email to YU asking whether YU could increase his order "to 30k-35k after discount."

e. On or about October 24, 2016, YU sent an email to MUNOZ stating that he had just emailed his "boss," in reference to a co-conspirator in China, to ask if "he can add more order for this week," asking MUNOZ to check with CC-1 if certain missing products from the Company were at the University Stockroom, and stating that YU would "double check with the people in China" to see if they had received the items.

## 2017

f. On or about August 1, 2017, MUNOZ sent an email to Researcher-1's email address with the University to determine whether Researcher-1 had left the University and, therefore, whether MUNOZ and YU could use

8

Researcher-1's name and email address to place fraudulent orders with the Company through the University Stockroom.

  g. On or about August 2, 2017, MUNOZ sent an email to YU containing Quotation 22324326 for a potential order from the Company in the name of Researcher-1 through the University Stockroom.

  h. On or about August 2, 2017, YU used Researcher-1's name, without authorization, to place Order 3018952039 from the Company through the University Stockroom for some of the products in Quotation 22324326.

  i. On or about August 4, 2017, YU sent an email to a co-conspirator in China containing ten order confirmations with a total value of over $25,000, including Order 3018952039 and Order 301893260, which contained cholera toxin, among other items.

  j. On or about August 16, 2017, YU sent a text message to CC-1 stating, "Morning David, please leave my boxes outside your office door, I will come at 12:00 to pick up."

## 2018

  k. On or about January 16, 2018, YU sent an email to MUNOZ stating that YU needed to "make at least $37500 (after 25% discount from $50000 order)" for the next two weeks because YU's "boss has over $70k order and he doesn't know how to make this happen in this and next week."

9

l.  On or about February 26, 2018, YU sent an email to MUNOZ asking why he had only been receiving at 25% discount in recent orders because he "usually" received a 26% discount.

m.  On or about July 9, 2018, YU placed Orders 3020991337 and 3020991201 from the Company through the University Stockroom, which included cocaine hydrochloride, codeine, morphine, and methamphetamine.

n.  On or about July 13, 2018, YU sent a text message to CC-1 telling CC-1 that he would arrive that afternoon to pick up his packages.

o.  On or about July 13, 2018, YU sent an email to a co-conspirator in China containing several order confirmations from the Company, including for Orders 3020991337 and 3020991201, which included cocaine hydrochloride, codeine, morphine, and methamphetamine.

## 2019

p.  On or about January 3, 2019, CC-1 sent a text message to MUNOZ stating that YU had received "over 60" packages from the Company that day at the University Stockroom.

q.  On or about September 17, 2019, YU used an alias to place Order 3023948475 with the Company through the University Stockroom, which included cocaine, heroin, and morphine.

r.  On or about September 20, 2019, YU sent a shipment from Tampa, Florida, to a co-conspirator in China, containing products from the

Company that was falsely manifested on shipping forms as containing "diluting agents."

## 2020

s.  On or about April 19, 2020, YU sent an email to MUNOZ concerning a quote that MUNOZ had prepared for products sold by the Company through the University Stockroom, requesting a 30% discount instead of a 27% discount.

t.  On or about May 26, 2020, YU used an alias to place Order 3024982918 with the Company through the University Stockroom, which included cholera toxin.

u.  On or about June 10, 2020, YU sent MUNOZ an email containing gift cards to various businesses totaling $800.

v.  On or about June 11, 2020, YU sent an email containing three Home Deport gift cards totaling $300 to CC-1 as payment for diverting packages from the University Stockroom.

w.  On or about June 12, 2020, YU sent an email to MUNOZ providing the Company's item catalogue identification number for cholera toxin, and asking, "my boss needs 10 of them, but it seems a DEA regulated item. Is there any way we can get it?"

x.  On or about June 12, 2020, MUNOZ sent an email to YU stating, "[t]his is the Cholera Toxin, Remember we had issues in the past and they require a lot of documentation signed by the University."

y. On or about June 17, 2020, YU sent a text message to CC-1 asking if CC-1 had received a $300 Home Depot gift card and requesting that CC-1 deliver four parcels to him on June 18, 2020.

z. On or about June 17, 2020, CC-1 sent a text message to YU thanking YU and agreeing to "keep an eye out" for YU's packages.

aa. On or about July 3, 2020, YU sent a shipment from Tampa, Florida, to a co-conspirator in China, containing products from the Company that was falsely manifested on shipping forms as containing "diluting agents."

## 2021

bb. On or about May 12, 2021, MUNOZ sent an email to YU containing the true names and email addresses and fictitious dates of birth for Researchers-1 and -2 so that their names and email addresses could be used to place fraudulent orders from the Company through the University Stockroom.

cc. On or about October 27, 2021, CC-1 sent a text message to YU stating, "With the boxes for [Researcher-1], did you want me to do something different with them? You have been getting boxes for that person for a while now so I wasn't sure if you want me to do something different with them."

dd. On or about November 1, 2021, MUNOZ issued a quote from the Company for YU in the name of Researcher-2, with a 27% discount, free overnight shipping, and a total discounted price of $11,880.16.

ee. On or about November 3, 2021, CC-1 sent an email to YU requesting payment for 36 hours of work.

ff.    On or about December 6, 2021, YU sent an email to MUNOZ stating, "Greg, I will give you $500 Target gift card when I see you next time."

gg.    On or about December 24, 2021, CC-2 sent YU photographs of several packages containing products from the Company that YU had ordered through the University Stockroom.

hh.    On or about December 24, 2021, CC-2 sent two shipments from Tampa, Florida, to a co-conspirator in China, containing products from the Company that were falsely manifested on shipping forms as containing "diluting agents."

## 2022

ii.    On or about January 7, 2022, MUNOZ sent an email to a Company employee requesting approval for a quote for products to be ordered through the University Stockroom with a discount of over 27% and a discounted price of over $13,000, falsely stating that the quote had been requested by Researcher-1.

jj.    On or about February 28, 2022, YU sent a text message to CC-1 stating, "Hello David, from now, pls keep boxes for me if you see the name [Researcher-2]."

kk.    On or about March 7, 2022, YU used Researcher-1's name to place Order 3028905793 from the Company through the University Stockroom, which included cocaine and morphine.

ll. On or about March 8, 2022, YU used Researcher-2's name to place Order 3028915210 from the Company through the University Stockroom, which included cocaine and morphine.

mm. On or about March 9, 2022, CC-1 sent a text message to YU stating that he would meet with an associate of YU to deliver the products that YU had ordered from the Company.

nn. On or about March 10, 2022, CC-2 sent a shipment containing products from the Company that was falsely manifested on shipping forms as containing "diluting agents" from Tampa, Florida, to a co-conspirator in China.

oo. On or about March 11, 2022, YU sent an email to a co-conspirator in China containing ten order confirmations from the Company, with a total discounted price of over $50,000.

pp. On or about June 28, 2022, YU used Researcher-1's name to place Order 3029605559 from the Company through the University Stockroom, which included cocaine hydrochloride and cholera toxin.

qq. On or about June 29, 2022, YU sent an email to MUNOZ stating that he could not log in to Researcher-1's email account and that he needed MUNOZ's assistance to reset the password.

rr. On or about June 30, 2022, YU sent a text message to CC-2 stating, "Names on my boxes," and then listing several names that YU used to order Company products through the University Stockroom, including Researcher-1's name.

ss. On or about December 5, 2022, MUNOZ generated Quote R-6556758.1 for products sold by the Company through the University Stockroom, listing the customer as CC-1 and using CC-1's University email address.

tt. On or about December 8, 2022, YU sent an email to CC-2 with the subject line "Packing Slip 12-8-2022," and an attachment identifying numerous products sold by the Company, including codeine, fentanyl, acetyl fentanyl, oxycodone, and ketamine.

uu. On or about December 9, 2022, CC-2 sent a shipment from Tampa, Florida, to a co-conspirator in China, containing products from the Company that was falsely manifested on shipping forms as containing "diluting agents."

vv. On or about December 12, 2022, with CC-1's permission, YU used CC-1's name and University email address to place Order 3030573289 from the Company through the University Stockroom.

ww. On or about December 18, 2022, MUNOZ sent an email to YU concerning the Company's internal investigation into MUNOZ's conduct in helping YU to place fraudulent orders through the University Stockroom, writing, "Wow I am really screwed now. Anti bribery anti kickback."

## 2023

xx. On or about January 18, 2023, YU sent an email to MUNOZ requesting a quote with discounts between 30% and 45% on a variety of Company products, requesting that MUNOZ use CC-3's University email address to make the

quote, and requesting that MUNOZ invent "an English/European name with the Dr. title" for the quote.

yy. On or about January 20, 2023, YU sent an email to MUNOZ containing Researcher-2's name and University email address and writing, "Do you remember you created below account long time ago? Is this account still active?"

zz. On or about February 9, 2023, CC-1 used his cell phone to take a photograph of a credit card in CC-3's name, which YU had ordered so that CC-3 could place orders through the University Stockroom.

aaa. On or about February 13, 2023, YU sent an email to MUNOZ asking for a 31% discount on certain Company products, and asking, "Do you still need Leticia [CC-3] to send you this order?"

bbb. On or about February 14, 2023, CC-3 placed Order 3030908246 from the Company through the University Stockroom, which included carbon tetrachloride.

ccc. On or about March 22, 2023, CC-1 used his cell phone to take a photograph of a Company invoice in the name of CC-3, which listed multiple products that CC-3 had purchased through the University Stockroom on behalf of YU.

ddd. On or about March 27, 2023, CC-3 placed Order 3030983594 from the Company through the University Stockroom, which included cholera toxin and pertussis toxin, also known as whooping cough.

eee. On or about April 6, 2023, YU sent a text message to CC-1 asking CC-1 to deliver packages ordered from the Company to an associate of YU that evening.

fff. On or about April 6, 2023, CC-1 sent photographs of the Company packing slips to YU for packages that had been delivered to the University Stockroom.

ggg. On or about April 7, 2023, CC-2 sent a shipment from Tampa, Florida, to a co-conspirator in China, containing products from the Company that had been ordered by CC-3 and others and that was falsely manifested on shipping forms as containing "diluting agents." U.S. Customs and Border Protection seized the parcel and determined that it contained contain codeine, methamphetamine, methadone, and oxycodone.

All in violation of 18 U.S.C. § 1349.

## FORFEITURE ALLEGATIONS

1. The allegations contained in Count 1 are incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

2. Upon conviction of a conspiracy to violate 18 U.S.C. § 1343, the defendants shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

3. The property to be forfeited includes, but is not limited to, a $100,000

order of forfeiture, which represents the amount of criminal proceeds the defendant obtained as a result of the commission of the offense.

5. If any of the property described above, as a result of any act or omission of the defendants:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

ROGER B. HANDBERG  
United States Attorney

By: _____  
Daniel J. Marcet  
Assistant United States Attorney  
Chief, National Security Section

By: _____  
Cherie L. Krigsman  
Assistant United States Attorney  
Deputy Chief, National Security Section

JENNIFER K. GELLIE  
Acting Chief  
Counterintelligence and Export Control Section

By: _____  
Garrett Coyle  
Counterintelligence and Export Control Section  
Trial Attorney