AF Approval _____   Chief Approval _____

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA

     v.                                      CASE NO.

PEN YU, a/k/a "Ben Yu"

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Roger B. Handberg, United States Attorney for the Middle District of Florida, and the defendant, Pen Yu, and the attorney for the defendant, Robert Zlatkin, mutually agree as follows:

## A.     Particularized Terms

### 1.     Count Pleading To

The defendant shall enter a plea of guilty to Count One of the Information. Count One charges the defendant with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349.

### 2.     Maximum Penalties

Count One carries a maximum sentence of 20 years' imprisonment, a fine of $1,000,000.00, or twice the gross gain caused by the offense, or twice the gross loss caused by the offense, whichever is greater, a term of supervised release of not more than three years, and a special assessment of $100. With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the

offense, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense, or to the community, as set forth below.

3.   Elements of the Offense

The defendant acknowledges understanding the nature and elements of the offense with which the defendant has been charged and to which the defendant is pleading guilty.  The elements of Count One are:

First:      Two or more people in some way agreed to try to accomplish a shared and unlawful plan to commit wire fraud, in violation of 18 U.S.C. § 1343; and

Second:   The defendant knew the unlawful purpose of the plan and willfully joined in it.

4.   Indictment Waiver

The defendant will waive the right to be charged by way of indictment before a federal grand jury.

5.   No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

6.   Mandatory Restitution to Victim of Offense of Conviction

Pursuant to 18 U.S.C. § 3663A(a) and (b), defendant agrees to make full

restitution, if applicable, as determined by the Court at sentencing.

    7.    <u>Guidelines Sentence</u>

        Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

    8.    <u>Acceptance of Responsibility - Three Levels</u>

        At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

        Further, at the time of sentencing, if the defendant's offense level prior

to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG §3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5, the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level.  The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9. <u>Cooperation - Substantial Assistance to be Considered</u>

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require.  If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United

States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both.  If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b).  In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

      10.    <u>Use of Information - Section 1B1.8</u>

      Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

11.     <u>Cooperation - Responsibilities of Parties</u>

a.      The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime.  However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b.      It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1)     The defendant may be prosecuted for any perjury or false declarations committed while testifying pursuant to this agreement, or for obstruction of justice.

(2)     The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement.  With regard

to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recission of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)     The United States may prosecute the defendant for any offenses set forth herein, the prosecution of which in accordance with this agreement the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)     The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

           (5)      The defendant will not be permitted to withdraw the guilty

pleas to those counts to which defendant hereby agrees to plead in the instant case

but, in that event, defendant will be entitled to the sentencing limitations, if any, set

forth in this plea agreement, with regard to those counts to which the defendant has

pled; or in the alternative, at the option of the United States, the United States may

move the Court to declare this entire plea agreement null and void.

           c.      As described in United States Sentencing Guidelines Section 1B1.8,

the government agrees that self-incriminating information provided pursuant to this

agreement will not be used against the defendant, except to the extent provided

herein. As provided in USSG § 1B1.8(b), this agreement shall not be applied to

restrict the use of information: (1) known to the government prior to entering into the

cooperation agreement; (2) concerning the existence of prior convictions and

sentences in determining § 4A1.1 (Criminal History Category) and § 4B1.1 (Career

Offender); (3) in a prosecution for perjury or giving a false statement; (4) in the event

there is a breach of the cooperation agreement by the defendant; or (5) in

determining whether, or to what extent, a downward departure is warranted

pursuant to a government motion under § 5K1.1.

      82.   <u>Forfeiture of Assets</u>

          The defendant agrees to forfeit to the United States immediately and

voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), whether in the possession or control of the United States, the defendant or defendant's nominees.  The assets to be forfeited specifically include, but are not limited to, the $100,000 in proceeds the defendant admits he obtained, as the result of the commission of the offense to which the defendant is pleading guilty.  The defendant acknowledges and agrees that:  (1) the defendant obtained this amount as a result of the commission of the offense, and (2) as a result of the acts and omissions of the defendant, the proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence.  Therefore, the defendant agrees that, pursuant to 21 U.S.C. § 853(p), the United States is entitled to forfeit any other property of the defendant (substitute assets), up to the amount of proceeds the defendant obtained, as the result of the offense of conviction.  The defendant further consents to, and agrees not to oppose, any motion for substitute assets filed by the United States up to the amount of proceeds obtained from commission of the offense and consents to the entry of the forfeiture order into the Treasury Offset Program.  The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

The defendant additionally agrees that since the criminal proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence, the preliminary and final orders of forfeiture should

authorize the United States Attorney's Office to conduct discovery (including depositions, interrogatories, requests for production of documents, and the issuance of subpoenas), pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, to help identify, locate, and forfeit substitute assets.

The defendant also agrees to waive all constitutional, statutory, and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all substitute assets and to transfer custody of such assets to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and

complete disclosure of all assets over which defendant exercises control, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets.  The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to any substitute assets before the defendant's sentencing.  In addition to providing full and complete information about substitute assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the

defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement.  The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

**B.**   **Standard Terms and Conditions**

1.   Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement.  The defendant further understands that compliance with any restitution payment plan

imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013.  The special assessment is due on the date of sentencing.

The defendant understands that this agreement imposes no limitation as to fine.

2.   <u>Supervised Release</u>

The defendant understands that the offense to which the defendant is pleading provides for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.   <u>Immigration Consequences of Pleading Guilty</u>

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4.   <u>Sentencing Information</u>

The United States reserves its right and obligation to report to the Court

and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies.  The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

     5.    <u>Financial Disclosures</u>

     Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition.  The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which she has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years.  The defendant similarly agrees and authorizes the United States Attorney's

Office to provide to, and obtain from, the United States Probation Office, the

financial affidavit, any of the defendant's federal, state, and local tax returns, bank

records and any other financial information concerning the defendant, for the

purpose of making any recommendations to the Court and for collecting any

assessments, fines, restitution, or forfeiture ordered by the Court.  The defendant

expressly authorizes the United States Attorney's Office to obtain current credit

reports in order to evaluate the defendant's ability to satisfy any financial obligation

imposed by the Court.

> 6.   <u>Sentencing Recommendations</u>

It is understood by the parties that the Court is neither a party to nor

bound by this agreement.  The Court may accept or reject the agreement, or defer a

decision until it has had an opportunity to consider the presentence report prepared

by the United States Probation Office.  The defendant understands and

acknowledges that, although the parties are permitted to make recommendations and

present arguments to the Court, the sentence will be determined solely by the Court,

with the assistance of the United States Probation Office.  Defendant further

understands and acknowledges that any discussions between defendant or

defendant's attorney and the attorney or other agents for the government regarding

any recommendations by the government are not binding on the Court and that,

should any recommendations be rejected, defendant will not be permitted to

withdraw defendant's plea pursuant to this plea agreement.  The government

expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7. <u>Defendant's Waiver of Right to Appeal the Sentence</u>

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8. <u>Middle District of Florida Agreement</u>

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring

defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.   Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this case, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.   Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind.  The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any).  The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the

attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial.  The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement.  The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.   <u>Factual Basis</u>

Defendant is pleading guilty because defendant is in fact guilty.  The defendant certifies that defendant does hereby admit that the facts set forth below are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

<u>FACTS</u>

**<u>Background</u>**

The "Company" was a United States-based chemical and biotechnology company that offered substantial discounts and other benefits to large institutional clients, such as university laboratories. The Company also partnered with some university laboratories to operate stockrooms. Ordering through the Company's

university laboratory stockrooms offered university customers significant discounts and also provided for other benefits, such as free products, free overnight shipping, and exemption from state and local taxes. The Company permitted only individuals affiliated with the laboratories to order through the stockrooms.

The "University" was a public university located in the Northern District of Florida. The University operated numerous research laboratories.

GREGORY MUNOZ was a United States citizen residing in Minneola, Florida. MUNOZ was employed as a salesperson for the Company. MUNOZ's sales area encompassed several universities in Florida, including the University.

PEN YU, a/k/a "Ben," was a United States citizen residing in Gibsonton, Florida, and elsewhere. YU worked to obtain discounted products from the Company on behalf of one or more co-conspirators in China.

Co-Conspirator 1 ("CC-1") was a United States citizen residing in Gainesville, Florida. CC-1 worked in the laboratory stockroom for a research laboratory at the University (the "the University Stockroom").

Co-Conspirator 2 ("CC-2") was a United States citizen residing in Gibsonton, Florida.

Researcher-1 and Researcher-2 were researchers who, prior to 2015, worked at the University. After Researchers-1 and -2 left the University, MUNOZ and YU used their names and email addresses, without their knowledge or authorization, to place orders with the Company through the University Stockroom.

Researcher-3 was also a researcher who operated a laboratory at the

University. Researcher-3's laboratory hosted the University Stockroom. YU, MUNOZ, and other co-conspirators falsely represented that they were affiliated with research being conducted in Researcher-3's laboratory in order to fraudulently place orders with the Company through the University Stockroom. Orders placed from the Company through the University Stockroom received benefits like substantial discounts in excess of 25% and free overnight shipping.

Co-Conspirator 3 ("CC-3") was a Chinese national and a student at the University who was not affiliated with any medical or scientific research. YU paid CC-3 and other students to use their University emails to place orders through the University Stockroom.

### Overview of Conspiracy

Between July of 2016 and May of 2023, MUNOZ used his position at the Company to help YU to fraudulently obtain discounts and other benefits from the Company through the University Stockroom. YU would receive orders of products from one or more co-conspirators in China, and he would then relay those orders to MUNOZ. MUNOZ used his position at the Company to create quotes for the products that YU wished to purchase. MUNOZ falsely represented to the Company that these purchases were being made by former University researchers, as well as CC-1, CC-2, CC-3 and others, when in truth the orders were all being placed by YU on behalf of one or more co-conspirators in China. These false representations

enabled YU to place orders through the University Stockroom and thereby receive benefits that the Company offered to individuals conducting research at the University, such as substantial discounts, free products, and free overnight shipping.

Once the products that YU ordered were delivered to the University Stockroom, CC-1 opened the packages and documented their contents, which frequently included controlled substances such as analytical standards of cocaine, fentanyl, and methamphetamine. CC-1 would then set aside the products belonging to YU or would deliver them to YU, CC-2, and others, who repackaged the products for export to one or more co-conspirators in China. YU and CC-2 undervalued these exports in Electronic Export Information ("EEI") contained in the Automated Export System and other shipping forms, and they falsely represented that the packages that they sent to China contained "diluting agents." In truth, the packages sent to China contained a wide variety of fraudulently obtained products from Company 1, including analytical standards of List 1 chemicals, controlled substances, and purified noncontagious proteins (PNP) of contagious diseases. YU then sent emails to one or more co-conspirators in China containing order confirmations from the Company for all the products that he had exported to China, who in turn sold these deeply discounted products to laboratories in China for a profit.

In total, YU and others acting at his direction placed thousands of fraudulent orders with the Company, and sent hundreds of shipments containing false export information to one or more co-conspirators in China. The chart below summarizes

the fraudulently obtained discounts that MUNOZ provided to YU during the course of the conspiracy:

| Year | Orders | Total Cost | Discounts from List Price | Percentage Discount |
|---|---|---|---|---|
| **2016** | 5,896 | $725,034.18 | $241,135.74 | 33.3% |
| **2017** | 12,464 | $1,819,106.21 | $563,534.15 | 31.0% |
| **2018** | 17,532 | $2,004,879.61 | $649,850.13 | 32.4% |
| **2019** | 20,953 | $2,531,364.12 | $856,572.53 | 33.8% |
| **2020** | 15,956 | $2,010,340.07 | $784,406.77 | 39.0% |
| **2021** | 17,441 | $2,388,867.07 | $928,013.39 | 38.8% |
| **2022** | 14,995 | $2,122,261.15 | $831,635.65 | 39.2% |
| **2023** | 588 | $152,581.57 | $84,339.65 | 55.3% |
| **Total** | **105,825** | **$13,754,434.66** | **$4,939,488.01** | **35.9%** |

In addition, by ordering through the University Stockroom, YU obtained additional benefits, such as free items at times and over $800,000 worth of free overnight shipping.

MUNOZ benefited from his participation in the conspiracy through increased bonuses from the Company, as well as giftcards received from YU, all of which totaled in excess of $100,000. YU was paid by one or more co-conspirators in China for his work in furtherance of this conspiracy, and he too received substantially more than $100,000 for his efforts. YU compensated CC-1, CC-2, and other coconspirators with giftcards, trips, and loans, and paid CC-3 and other co-conspirators for their efforts in furtherance of the conspiracy.

**2016**

In 2016, MUNOZ began to create quotes for YU to order through the University Stockroom. For example, on July 8, 2016, YU sent an email to MUNOZ titled "First Order," which contained a spreadsheet listing over 140 items that YU wished to order from the Company through the University Stockroom. Thereafter, MUNOZ regularly helped YU to order items through the University Stockroom, even though YU had no affiliation with the University. In total, YU placed over 5,800 orders through the University Stockroom, in which he received discounts in excess of $240,000.

YU and MUNOZ relied on CC-1 to set aside the items ordered through the University Stockroom until they could retrieve the items. For example, on or about August 3, 2016, YU sent an email to CC-1 regarding boxes from the Company that CC-1 had diverted for YU. YU wrote that he "may come over tomorrow (Thursday) to pick up the [Company] boxes." Later that same month, CC-1 sent a text message to YU concerning shipments from the Company that YU had ordered to the University Stockroom, writing: "I have about 23 boxes from [the Company] for you. Some of them are fairly large." Again on September 14, 2016, CC-1 sent a text message to YU stating, "Ben, I believe I have 35 or 36 boxes for you today." After CC-1 sent each of these messages, YU or an individual working on his behalf met with CC-1 to retrieve the products from the Company for export to China.

Throughout the remainder of 2016, YU, MUNOZ, and CC-1 continued to operate in this fashion. For example, on October 24, 2016, YU sent an email to MUNOZ requesting a quote from the Company for several products to be ordered through the University Stockroom with a total value of approximately $31,000, and requesting a discount of 26%. That same day, MUNOZ set an email to YU asking whether YU could increase his order "to 30k-35k after discount." YU responded that he had just emailed his "boss," in reference to a co-conspirator in China, to ask if "he can add more order for this week." YU further asked MUNOZ to ask CC-1 about certain missing products that YU had ordered from the Company. YU requested that MUNOZ have CC-1 check whether the missing products were still in the University Stockroom, and stated that he would "double check with the people in China"— referring to one or more co-conspirators in China—to see if they had already received the missing items.

### 2017

In 2017, MUNOZ and YU expanded the scheme to place orders in the name of individuals who appeared to be affiliated with the University, in order to avoid raising suspicion with the Company concerning the large volume of orders that they were placing. That year, YU placed over 12,000 orders through the University Stockroom. CC-1 continued to assist YU and MUNOZ in diverting packages from the Company after they arrived at the University Stockroom.

For example, on August 1, 2017, MUNOZ sent an email to Researcher-1's email address with the University to determine whether Researcher-1 had left the University and, therefore, whether MUNOZ and YU could use Researcher-1's name and email address to place fraudulent orders with the Company through the University Stockroom. MUNOZ received an automated reply stating that Researcher-1's email address was no longer active because she had left the University years earlier.

On August 2, 2017, MUNOZ sent an email to YU containing Quotation 22324326 for a potential order from the Company in the name of Researcher-1 through the University Stockroom. That same day, YU used Researcher-1's name, without authorization, to place Order 3018952039 from the Company through the University Stockroom for some of the products in Quotation 22324326. On August 4, 2017, YU sent an email to a co-conspirator in China containing ten order confirmations with a total value of over $25,000, including Order 3018952039 and Order 301893260, which contained PNP of cholera toxin, among other items. On August 16, 2017, YU sent a text message to CC-1 stating, "Morning [CC-1], please leave my boxes outside your office door, I will come at 12:00 to pick up." In this message, YU was directing CC-1 to set aside his packages—including packages obtained fraudulently in the name of Researcher-1—so that YU could obtain them for export to China.

YU also obtained analytical standards of controlled substances for export to

China. For example, on November 27, 2017, YU used an alias to place Order 3019647700 from the Company through the University Stockroom, which included analytical standards of cocaine hydrochloride. That same day, CC-1 sent a text message to YU stating that, on the following day, he would leave packages for YU outside of his office so that YU could pick them up.

## 2018

In 2018, YU ordered over 17,000 products through the University Stockroom based on quotes that MUNOZ prepared. YU received discounts in excess of $649,000. CC-1 continued to assist in diverting packages from the Company after they arrived at the University Stockroom.

For example, on January 16, 2018, YU sent an email to MUNOZ stating that YU needed to "make at least $37500 (after 25% discount from $50000 order)" for the next two weeks because his "boss has over $70k order and he doesn't know how to make this happen in this and next week." In this email, YU was telling MUNOZ that a co-conspirator in China had a substantial volume of orders to place over the following two weeks.

On July 9, 2018, YU placed Orders 3020991337 and 3020991201 from the Company through the University Stockroom, which included analytical standards of the controlled substances cocaine hydrochloride, codeine, morphine, and methamphetamine. Four days later, on July 13, 2018, YU sent a text message to CC1 telling CC-1 that he would arrive that afternoon to pick up his packages. That

same day, YU sent an email to a co-conspirator in China containing several order confirmations for products from the Company that YU had exported to China, including for Orders 3020991337 and 3020991201, which included numerous controlled substances.

## 2019

In 2019, YU ordered nearly 21,000 products through the University Stockroom based on quotes that MUNOZ prepared. YU received discounts in excess of $856,000. CC-1 continued to assist in diverting packages from the Company after they arrived at the University Stockroom.

For example, on January 3, 2019, CC-1 sent a text message to MUNOZ stating that YU had received "over 60" packages from the Company that day at the University Stockroom. CC-1 was holding these packages until YU could retrieve them for export to China.

In early March of 2019, YU placed several orders with the University Stockroom based on quotes that MUNOZ had prepared. On March 15, YU sent an email to CC-1 asking him to check three tracking numbers for parcels that were supposed to have been delivered to the University Stockroom on March 12. That same day, CC-1 responded that certain packages had arrived on March 11, 2019, "and should have been with the packages you picked up." Later that day, YU exported a shipment from Tampa, Florida, to a co-conspirator in China, containing

products from the Company that was falsely manifested on shipping forms as containing "diluting agents."

On September 17, 2019, YU used an alias to place Order 3023948475 with the Company through the University Stockroom, which included analytical standards of cocaine, heroin, and morphine. On September 20, 2019, YU sent a shipment from Tampa, Florida, to a co-conspirator in China, containing products from the Company that was falsely manifested on shipping forms as containing "diluting agents."

### 2020

In 2020, YU ordered over 15,000 products through the University Stockroom based on quotes that MUNOZ prepared. YU received discounts in excess of $784,000. CC-1 continued to assist YU and MUNOZ in diverting packages from the Company after they arrived at the University Stockroom.

For example, on April 19, 2020, YU sent an email to MUNOZ concerning a quote that MUNOZ had prepared for products sold by the Company through the University Stockroom, requesting a 30% discount instead of a 27% discount.

On April 24, 2020, YU sent text messages to CC-1 agreeing to loan CC-1 $130,000. The purpose of the loan was to enable CC-1 to purchase a residential property. CC-1 agreed to continue working in furtherance of the conspiracy in order to pay off this loan.

On May 26, 2020, YU used an alias to place Order 3024982918 with the

Company through the University Stockroom, which included PNP of cholera toxin. On June 12, 2020, YU sent an email to MUNOZ providing the Company's item catalogue identification number for PNP of cholera toxin, and asking, "my boss needs 10 of them, but it seems a DEA regulated item. Is there any way we can get it?" That same day, MUNOZ responded, "[t]his is the Cholera Toxin, Remember we had issues in the past and they require a lot of documentation signed by the University."

Throughout the conspiracy, YU also compensated MUNOZ, CC-1, and other co-conspirators with gift cards. For example, on June 10, 2020, YU sent MUNOZ an email containing gift cards to various businesses totaling $800. On June 11, 2020, YU sent an email containing three Home Depot gift cards totaling $300 to CC-1 as payment for diverting packages from the University Stockroom.

On June 17, 2020, YU sent a text message to CC-1 asking if CC-1 had received a $300 Home Depot gift card, and requesting that CC-1 deliver four parcels to him on June 18. CC-1 responded that he would "keep an eye out" for YU's packages. YU subsequently obtained the packages from the Company that YU had diverted for him. On July 3, 2020, YU sent a shipment containing products from the Company that was falsely manifested on shipping forms as containing "diluting agents" from Tampa, Florida, to a co-conspirator in China.

## 2021

In 2021, YU ordered over 17,000 products through the University Stockroom based on quotes that MUNOZ prepared. YU received discounts in excess of $928,000. CC-1 continued to assist YU and MUNOZ in diverting packages from the Company after they arrived at the University Stockroom. Additionally, in 2021, CC2 also began to assist YU by sending packages containing Company products to China.

For example, on March 15, 2021, YU used an alias to place Order 3026725269 with the Company through the University Stockroom, which included analytical standards of cocaine, ketamine, morphine, and codeine. On March 18, 2021, YU sent a text message to CC-1 requesting that CC-1 help "consolidate" YU's boxes at the University Stockroom before the weekend, in reference to products that YU had ordered from the Company, including analytical standards of controlled substances. On March 26, 2021, YU sent a shipment containing products from the Company that was falsely manifested on shipping forms as containing "diluting agents" from Tampa, Florida, to a co-conspirator in China.

On May 2, 2021, YU sent an email to CC-1 concerning the work that CC-1 was doing in furtherance of the conspiracy. YU wrote:

THREE things need your help.

1) Check packing slips from each box as you had done before. 2) Put the glass bottles into the cubic Styrofoam box, make sure all the same size bottles you put in the same bubble wrap bag (pls see my attached pictures)

Keep the same size of cardboard for me.
The rest of the [Company] material (non-glass bottles items, you just put into the cardboard as you had before)
3) Can you drive to see me after work on each Thursday (anytime at your convenience, you choose, but it has to be before Friday 8:00am)
If yes, let me know if you can drive ONE WAY 1 hr distance or ONE WAY 2 hr distance. (Then I'll let you know where to meet) If no, lets ok. I will just drive by myself to the stockroom on each Thursday like before.
For this additional money you put on the mobile home, we just add $15/hr for each week you help me (including the hrs you drive on the road). I will also give you additional $10 for ONE WAY 1 hr distance or additional $20 for ONE WAY 2 hr distance for gas. (I will pump the gas for you at the place where we meet)

Thereafter, YU and CC-1 regularly communicated about how much money CC-1 had earned. For example, on May 6, 2021, YU sent an email to CC-1 confirming that CC-1 had earned $855 for his work on behalf of YU.

On May 12, 2021, MUNOZ sent an email to YU containing the true names and email addresses and fictitious dates of birth for Researchers-1 and -2 so that their names and email addresses could continue to be used to place fraudulent orders from the Company through the University Stockroom. On October 27, 2021, CC-1 sent a text message to YU stating, "With the boxes for [Researcher-1], did you want me to do something different with them? You have been getting boxes for that person for a while now so I wasn't sure if you want me to do something different with them."

On November 1, 2021, MUNOZ issued a quote from the Company for YU in the name of Researcher-2, with a 27% discount, free overnight shipping, and a total

discounted price of $11,880.16. On December 6, 2021, YU sent an email to MUNOZ stating, "Greg, I will give you $500 Target gift card when I see you next time."

On December 23, 2021, CC-1 used his cell phone to take a photograph of a Company packing slip for products ordered by YU in the name of Researcher-1, which listed, among other products, analytical standards of cocaine. On December 24, 2021, YU sent a text message to CC-1 requesting photographs of packing slips for orders that YU had placed from the Company through the University Stockroom.

On December 24, 2021, CC-2 sent YU photographs of several packages containing products from the Company that YU had ordered through the University Stockroom, and which had been diverted by CC-1. Later that same day, CC-2 sent two shipments from Tampa, Florida, to a co-conspirator in China, containing products from the Company that were falsely manifested on shipping forms as containing "diluting agents."

### 2022

In 2022, YU ordered over 14,000 products through the University Stockroom based on quotes that MUNOZ prepared. YU received discounts in excess of $831,000. CC-1 continued to assist YU and MUNOZ in diverting packages from the Company after they arrived at the University Stockroom, and CC-2 continued to assist YU by sending packages containing Company products to China. Furthermore, in late 2022, both CC-2 and CC-1 assisted YU in placing fraudulent orders with the Company.

For example, on January 7, 2022, MUNOZ sent an email to a Company employee requesting approval for a quote for products to be ordered through the University Stockroom with a discount of over 27% and a discounted price of over $13,000, falsely stating that Researcher-1 had requested the quote. On January 10, 2022, YU sent an email to the Company placing an order through the University Stockroom for Quote R-490752.1, which MUNOZ had prepared in the name of Researcher-1, with a discount of 27% and a total discounted price of $10,824.76. On January 13, 2022, CC-1 sent a text message to YU containing a photograph of Company products that had arrived at the University Stockroom.

On January 31, 2022, YU sent an email to the Company placing an order through the University Stockroom for Quote R-490752.1, which MUNOZ had prepared in the name of Researcher-1, with a discount of 26% and a total discounted price of $6,678.20. On February 2, 2022, CC-1 sent a text message to YU stating that he would meet YU's associate the following day to deliver packages sent by the Company to the University Stockroom. On February 4, 2022, YU sent a shipment from Tampa, Florida, to a co-conspirator in China, containing products from the Company that was falsely manifested on shipping forms as containing "diluting agents."

On February 28, 2022, YU sent a text message to CC-1 stating, "Hello [CC-1], from now, pls keep boxes for me if you see the name [Researcher-2]." In this message, YU was informing CC-1 that he was placing fraudulent orders in the name of Researcher-2, and that CC-1 should divert those products as well.

Between March 4 and 8, 2022, YU placed several orders in the name of Researchers-1 and -2, which were based on fraudulent quotes prepared by MUNOZ. For example, on March 4, YU used Researcher-1's name to place Order 3028896006 from the Company through the University Stockroom, which included analytical standards of cocaine and amphetamine. On March 7, YU used Researcher-1's name to place Order 3028905793 from the Company through the University Stockroom, which included analytical standards of cocaine and morphine. On March 8, YU used an alias to place Order 3028916936 from the Company through the University Stockroom, which analytical standards of included cocaine hydrochloride. On March 8, YU used Researcher-2's name to place Order 3028915210 from the Company through the University Stockroom, which included analytical standards of cocaine and morphine.

On March 9, 2022, CC-1 sent a text message to YU stating that he would meet with an associate of YU to deliver the products that YU had ordered from the Company to the University Stockroom. On March 10, CC-2 sent a shipment from Tampa, Florida, to a co-conspirator in China, containing products from the Company that was falsely manifested on shipping forms as containing "diluting agents." On March 11, YU sent an email to a co-conspirator in China containing ten order confirmations from the Company, with a total discounted price of over $50,000.

On June 10, 2022, YU and CC-2 discussed a mortgage that YU intended to provide to CC-2, and which CC-2 could pay off, in part, by working in furtherance of the conspiracy. The total amount of the mortgage was $460,000, with a 2.5% interest rate.

On June 28, 2022, YU used Researcher-1's name to place Order 3029605559 from the Company through the University Stockroom, which included analytical standards of cocaine hydrochloride and cholera toxin. On June 29, YU sent an email to MUNOZ stating that he could not log in to Researcher-1's email account and that he needed MUNOZ's assistance to reset the password. On June 30, YU sent a text message to CC-2 stating, "Names on my boxes," and then listing several names that YU used to order Company products through the University Stockroom, including Researcher-1's name. In this message, YU was providing CC-2 with a list of the names that YU had been using to place fraudulent orders through the Company.

On July 5, 2022, YU sent a text message to CC-2 requesting that CC-2 meet with an associate of YU who would be receiving boxes from CC-1. On July 8, CC-2 sent a shipment from Tampa, Florida, to a co-conspirator in China, containing products from the Company that was falsely manifested on shipping forms as containing "diluting agents."

On August 6, 2022, YU sent a text message to CC-2 instructing CC-2 to "correct value to $520," meaning to falsely represent on shipping forms that the value of each shipment to China was only $520.

On August 11, 2022, CC-1 sent an email from his personal email address to his email address with the University with the subject line "Pen wrong item 8-10-22," which contained photographs of a packing slip from the Company in the name of Researcher-1, as well as photographs of products from the Company. On August 12, CC-1 sent an email to YU containing photographs of a packing slip from the Company in the name of Researcher-1 to YU, as well as photographs of chemicals from the Company.

On October 31, 2022, YU placed Order 3030336804 from the Company through the University Stockroom, which included analytical standards of fentanyl, morphine, MDMA, methamphetamine, amphetamine, acetylmorphine, cocaine, codeine, and methadone. On November 4, CC-2 sent a shipment from Tampa, Florida, to a co-conspirator in China, containing products from the Company that was falsely manifested on shipping forms as containing "diluting agents."

In November and December 2022, with CC-1's permission, MUNOZ used CC-1's name and University email address to generate several fraudulent quotes on behalf of YU. YU then ordered the products in CC-1's name. For example, on November 21, 2022, YU used CC-1's name and University email address to place Order 3030462628 from the Company through the University Stockroom. In the following days, YU and CC-1 exchanged text messages concerning the orders that YU had placed in CC-1's name, and YU requested that CC-1 forward to YU the emails containing the order confirmations, which had been sent to CC-1's University

email address. On December 5, 2022, MUNOZ generated Quote R-6556758.1 for products sold by the Company through the University Stockroom, listing the customer as CC-1 and using CC-1's University email address. On December 12, 2022, with CC-1's permission, YU used CC-1's name and University email address to place Order 3030573289 from the Company through the University Stockroom.

In December, YU and MUNOZ also began to use CC-2 to place fraudulent orders with the Company. For example, on December 2, 2022, YU sent an email directing CC-2 to place an order for Quotation R-6534918.1 with the Company through the University Stockroom, and directing CC-2 to provide his own email and phone number for the order, which CC-2 did. That same day, YU sent a text message asking CC-1 to set aside boxes from the Company bearing CC-2's name. On December 14, 2022, CC-2 placed another order on behalf of YU with the Company through the University Stockroom.

YU also sought to recruit CC-1's wife to help place fraudulent orders with the Company. For example, on December 4, 2022, YU sent a text message to CC-1 asking whether CC-1's wife would be interested in YU sponsoring her to take a class at the University. On December 8, YU sent text messages to CC-1 stating that he would pay for CC-1's wife's tuition and books, and that "the reason for doing this, is because my boss needs school email to make more purchase power for his order." CC-1 responded that he understood that YU wished to use CC-1's wife's University

email address so that YU could procure more products from the Company on behalf of a co-conspirator in China.

On December 8, 2022, CC-1 sent a text message to YU, stating that he would meet an individual working on YU's behalf that day to deliver items ordered from the Company. Later that same day,  YU sent an email to CC-2 with the subject line "Packing Slip 12-8-2022," and an attachment identifying numerous products sold by the Company, including analytical standards of codeine, fentanyl, acetyl fentanyl, oxycodone, and ketamine, which had been diverted by CC-1 from the University Stockroom for export to China. On December 9, CC-2 sent a shipment from Tampa, Florida, to a co-conspirator in China, containing products from the Company that was falsely manifested on shipping forms as containing "diluting agents."

In December of 2022, MUNOZ learned that the Company was investigating his conduct. On December 18, 2022, MUNOZ sent an email to YU concerning the Company's internal investigation into MUNOZ's conduct in helping YU to place fraudulent orders through the University Stockroom, writing, "Wow I am really screwed now. Anti bribery anti kickback."

## 2023

In 2023, YU placed over 580 orders through the University Stockroom based on quotes that MUNOZ had prepared. YU received discounts in excess of $84,000. CC-1 continued to assist YU and MUNOZ in diverting packages from the Company

after they arrived at the University Stockroom, and CC-2 continued to export items to China.

For example, on January 20, 2023, YU sent an email to MUNOZ containing Researcher-2's name and University email address and writing, "Do you remember you created below account long time ago? Is this account still active?" In this email, YU was asking, in light of the Company's ongoing investigation, whether the conspirators could use Researcher-2's name to continue to place fraudulent orders.

In 2023, YU also sought to recruit students from the University, including CC3, to help place fraudulent orders from the Company. After CC-3 agreed to participate in this scheme, YU ordered a credit card in her name to be delivered to the University Stockroom and directed her to place orders on behalf of the conspiracy. In 2023, CC-3 placed over 60 orders at YU's direction. In placing these orders, CC-3 falsely represented to Company 1 that she was involved in "biomedical engineering" at the University, when in reality she was studying marketing.

For example, on January 18, 2023, YU sent an email to MUNOZ requesting a quote with discounts between 30% and 45% on a variety of Company products, requesting that MUNOZ use CC-3's University email address to make the quote, and requesting that MUNOZ invent "an English/European name with the Dr. title" for the quote. That same day, CC-3 sent an email to MUNOZ requesting a quote for several products sold by the Company, and falsely stating that she was "working in collaboration with other researchers" in biotechnology, and requesting "a good price

since we will be purchasing these items routinely." After receiving that email, MUNOZ sent text messages to YU, asking YU to direct CC-3 to change her email signature block, which stated that she was pursuing a degree in "business administration – finance," because the Company might inquire as to why a finance student was ordering scientific reagents. In these exchanges, MUNOZ and YU were discussing how CC-3 could best present herself in communications with the Company, in order to avoid raising suspicion when placing orders through the University Stockroom. After this exchange, CC-3 represented herself as a biomedical engineering student when placing orders with the Company.

On February 9, 2023, CC-1 received that credit card and used his cell phone to take a photograph of a credit card for YU. The credit card enabled CC-3 to pay for her fraudulent orders with the Company, and also provided an easy means for YU to compensate CC-3 for her assistance in the scheme.

On February 13, 2023, YU sent an email to MUNOZ asking for a 31% discount on certain Company products, and asking, "Do you still need [CC-3] to send you this order?" The following day, CC-3 placed Order 3030908246 from the Company through the University Stockroom, which included carbon tetrachloride.

On March 20, 2023, CC-1 sent a text message to YU stating that he would have "everything ready" for YU to pick up on March 23. On March 22, CC-1 used his cell phone to take a photograph of a Company invoice in the name of CC-3, which listed multiple products that CC-3 had purchased through the University

Stockroom on behalf of YU. On March 24, CC-2 sent text messages to YU containing a photograph of a box containing Company products, and stating that he was "heading to FedEx." Later that day, CC-2 sent a shipment from Tampa, Florida, to a co-conspirator in China, containing products from the Company that was falsely manifested on shipping forms as containing "diluting agents."

On March 27, 2023, CC-3 placed Order 3030983594 from the Company through the University Stockroom, which included PNP of cholera toxin and pertussis toxin, also known as whooping cough. On March 28, 2023, CC-1 sent a text message to YU agreeing to meet an associate of YU's on March 30. The purpose of the meeting was to deliver products that YU had ordered from the Company through the University Stockroom. On March 31, CC-2 sent a shipment from Tampa, Florida, to a co-conspirator in China, containing products from the Company that was falsely manifested on shipping forms as containing "diluting agents."

On April 6, 2023, YU sent a text message to CC-1 asking CC-1 to deliver packages ordered from the Company to an associate of YU that evening. CC-1 responded by sending photographs of Company packing slips to YU for packages that had been delivered to the University Stockroom. On April 7, CC-2 sent a shipment from Tampa, Florida, to a co-conspirator in China, containing products from the Company that had been ordered by CC-3 and others, and that was falsely manifested on shipping forms as containing "diluting agents." U.S. Customs and

Border Protection seized the parcel and determined that it contained numerous products that had been manufactured by the Company and sent to the University Stockroom, including analytical standards of cocaine, methamphetamine, methylenedioxyamphetamine, methadone, oxycodone, codeine, ketamine, and other controlled substances.

12.    Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or the defendant's attorney with regard to such guilty plea.

13.    Certification

The defendant and the defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that the defendant fully understands its terms.

DATED this ____13th____ day of _____March_____ , 2024.

ROGER B. HANDBERG
United States Attorney

Pen Yu
Defendant


Robert Zlatkin, Esq.
Attorney for Defendant

Daniel J. Marcet
Assistant United States Attorney
Chief, National Security Section


Cherie L. Krigsman
Assistant United States Attorney
Deputy Chief, National Security
Section